UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ZACKERY H.,

                    Plaintiff,

            -against-

FRANK BISIGNANO,
Commissioner of Social Security,

                   Defendant.
-------------------------------------------------------------X

**OPINION AND ORDER**

25 Civ. 5822 (JCM)

       Plaintiff Zackery H.[1] ("Plaintiff") commenced this action on July 15, 2025 pursuant to 42 U.S.C. § 405(g), challenging the decision of Frank Bisignano, the Commissioner of Social Security (the "Commissioner"), which denied Plaintiff's application for Supplemental Security Income ("SSI") under the Social Security Act ("SSA"). (Docket No. 1). Presently before the Court are (1) Plaintiff's motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 16) ("Motion"), accompanied by a memorandum of law, (Docket No. 17) ("Pl. Br."); (2) the Commissioner's opposition to Plaintiff's Motion, (Docket No. 19) ("Comm'r Br."); and (3) Plaintiff's reply, (Docket No. 20) ("Pl. Reply"). For the reasons set forth herein, Plaintiff's Motion is granted, and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion and Order.[2]

---

[1] Plaintiff's name has been partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] The parties have consented to the undersigned for all purposes, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Docket No. 11).

## I. BACKGROUND

Plaintiff was born on November 16, 1992. (R.[3] 21).  He applied for SSI on September 13, 2022, alleging a disability onset date of December 1, 2017. (R. 10).  Plaintiff's claim was initially denied on May 4, 2023, and again upon reconsideration on September 12, 2023. (*Id.*). Plaintiff then filed a written request for an administrative hearing to review the denial of his claim. (*Id.*).  Administrative Law Judge Kieran McCormack ("ALJ McCormack" or the "ALJ") held a hearing on May 30, 2024. (R. 10, 28-59).  On June 5, 2024, ALJ McCormack issued a written decision finding Plaintiff not disabled, and thus, not entitled to SSI. (R. 22).  Plaintiff requested review by the Appeals Council, which was denied on May 13, 2025, (R. 1-3), making the ALJ's decision ripe for review.

### A.  Medical Evidence

### 1.  Relevant Medical Evidence

Plaintiff has provided a summary of the medical evidence in the record. (*See* Pl. Br. at 5-19).[4]  The Commissioner "adopt[ed] Plaintiff's recitation of the relevant facts and underlying proceedings contained in [his brief] with the exception of any inferences, arguments, or conclusions asserted therein," and provided additional relevant facts. (Comm'r Br. at 7-10).  The Court adopts Plaintiff's summary of the medical evidence, as supplemented by the Commissioner's summary, as accurate and complete for the purposes of the issues raised in this suit.  The Court will also summarize the medical evidence pertinent to the adjudication of this case, as well as findings from certain treating providers and state examiners.

---

[3] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on September 29, 2025. (Docket No. 12).  All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration ("Administration").

[4] All page number citations to the parties' briefs refer to the page number assigned upon electronic filing unless otherwise noted.

**2. Dr. Arnaldo Gonzalez-Aviles, M.D.**

Dr. Arnaldo Gonzalez-Aviles, M.D. first met Plaintiff for a psychiatry evaluation on September 20, 2022. (R. 584-87).  At his initial appointment, Plaintiff stated that "he has a poor impulse problem" and that he "gets irritable and angered easily." (R. 584).  He told Dr. Gonzalez-Aviles that he was diagnosed with schizophrenia, but did not feel that he had the diagnosis. (*Id.*).  Plaintiff also said that he refused to take the risperidone medication he was prescribed after his last psychiatric hospitalization in August-September 2022,[5] but agreed to monthly visits. (R. 584, 586-87).  Dr. Gonzalez-Aviles noted that Plaintiff's insight was "limited," but he had "fair" judgement. (R. 586).  His assessments of Plaintiff included: (1) disorganized schizophrenia; (2) intermittent explosive disorder ("IED"); (3) sheltered homelessness; (4) cannabis abuse with cannabis-induced disorder; and (5) nicotine use disorder. (*Id.*).

Plaintiff continued to be treated by Dr. Gonzalez-Aviles in 2022.  At a follow-up appointment on October 18, 2022, (R. 650-52), Plaintiff admitted to being diagnosed with schizophrenia and agreed to take risperidone, (R. 650).  Dr. Gonzalez-Aviles reported that Plaintiff was "focused on the future and needing to work or get [social security disability]." (*Id.*).  He also stated that Plaintiff's IED "seems in control" and "risperidone can help this." (R. 651).  Plaintiff saw Dr. Gonzalez-Aviles again on November 2, 2022, (R. 653-54), and December 29, 2022, (R. 659-60).  At the November appointment, Dr. Gonzalez-Aviles' assessments of Plaintiff included: (1) disorganized schizophrenia; (2) sheltered homelessness; and (3) cannabis abuse

---

[5] Plaintiff was involuntarily admitted to the hospital in August 2022 following an incident at a mall in New Jersey. (R. 584).  A security guard confronted him at the mall because he was shirtless (he stated that "she [did] not understand[] that he was planning to buy a shirt as the one he had was sweaty because it was hot outside"); Plaintiff then exposed his genitals, and she called the police. (*Id.*).

with cannabis-induced disorder, (R. 654), and at the December appointment the assessments were: (1) disorganized schizophrenia; and (2) sheltered homelessness, (R. 660).

Plaintiff saw Dr. Gonzalez-Aviles for multiple follow-up appointments in 2023, including on January 25, 2023, (R. 663-64), March 6, 2023, (R. 669-70), April 6, 2023, (R. 671-74), May 16, 2023, (R. 675-76), June 22, 2023, (R. 677-78), July 24, 2023, (R. 679-80), August 21, 2023, (R. 684-86), September 8, 2023, (R. 687-88), November 20, 2023, (R. 689-91), and December 19, 2023, (R. 692-93). At the April 2023 appointment, Dr. Gonzalez-Aviles noted that Plaintiff's main symptoms occurred "when he is off meds and decompensates." (R. 671). At the May 2023 appointment, Plaintiff admitted to Dr. Gonzalez-Aviles "that he may forget to take the risperidone 2 days a week," (R. 675), but at the July 2023 appointment Plaintiff stated, "that he [was now] taking the risperidone daily" and "[d]enied any side effects," (R. 679). However, at his November 2023 appointment Plaintiff told Dr. Gonzalez-Aviles that he had not been taking his medication daily for the past few months, but that he now was. (R. 689).

Dr. Gonzalez-Aviles also prepared a Psychiatric Medical Report, (R. 618-21), and Medical Source Statement, (R. 622-24), each dated July 24, 2023. The Medical Source Statement evaluated Plaintiff's ability to do work-related activities on a sustained basis. (R. 622). Dr. Gonzalez-Aviles opined that Plaintiff had no limitations understanding, remembering, and carrying out simple instructions; and moderate limitations making judgments on simple work-related decisions, understanding, remembering, and carrying out complex instructions, and making judgments on complex work decisions. (R. 622). He further opined that Plaintiff had moderate limitations interacting appropriately with the public, supervisors, and coworkers, as well as responding appropriately to usual work situations and to changes in a routine work setting. (R. 623). Dr. Gonzalez-Aviles stated that Plaintiff "gets easily frustrated [and] angry,"

- 4 -

and has a "history of irritability and violence when frustrated." (R. 622-23).  In addition, he noted in the Psychiatric Medical Report that Plaintiff was "aware of his diagnosis[, but] at times stops medications and decompensate[s]." (R. 619).  He concluded that Plaintiff could manage benefits in his own interest. (R. 621, 624).

Dr. Gonzalez-Aviles also treated Plaintiff in 2024, including on January 18, 2024, (R. 694-95), and April 2, 2024, (R. 698-700).  The January 2024 appointment was supposed to be in-person, but Plaintiff overslept so it occurred via phone (Plaintiff was sleeping when the doctor called). (R. 694-95).  Dr. Gonzalez-Aviles discussed with Plaintiff the "importance of him complying with [medications] and [appointments]." (R. 695).  The doctor also noted that at the next appointment, he would "talk more" about why Plaintiff overslept – "is it that he [was] drinking and can't wake up, or what is the cause[?]" (*Id.*).  In April 2024, Dr. Gonzalez-Aviles reported that Plaintiff missed his appointment and showed up four hours late because he "overslept as usual." (R. 698).  The doctor also stated that Plaintiff missed, and did not reschedule, his February appointment. (*Id.*).  In addition, Dr. Gonzalez-Aviles noted "that [Plaintiff] had 3 months of meds here that he never picked up" and it was "[u]nclear why [Plaintiff] state[d] that he [had] enough meds." (*Id.*).  At that April appointment, he opined that Plaintiff's insight was "limited," and he offered Plaintiff a referral to other mental health clinics, but Plaintiff refused. (R. 698-99).

### 3.  Dr. Michael Rosenfeld, Psy.D.

On February 10, 2023, Plaintiff had a psychiatric consultative examination with Dr. Michael Rosenfeld, Psy.D. (R. 588-92).  Plaintiff's mother was present for the evaluation. (R. 588).  Dr. Rosenfeld's report reflects that Plaintiff completed high school and was in special education for behavioral issues. (*Id.*).  Plaintiff said he last worked as a parking valet for six

months in 2017, but stopped working when the business closed. (*Id.*).  He reported that he was looking for work and had attended a program to assist him in finding employment. (*Id.*).  Dr. Rosenfeld noted that Plaintiff had five prior inpatient psychiatric admissions and a schizophrenia diagnosis. (*Id.*).  Plaintiff said he was not receiving therapy, but saw Dr. Gonzalez-Aviles monthly. (*Id.*).  He did not report any medical issues or medications other than Risperdal. (*Id.*).

At the time of his evaluation, Plaintiff lived in a shelter in the Bronx. (*Id.*).  He could dress, bathe, and groom himself, manage money, do laundry, shop, and clean. (R. 590).  His driver's license was suspended, but he could take public transportation. (*Id.*).  Plaintiff reported having four to five friends and a positive relationship with his family. (*Id.*).  His day-to-day activities included watching sports and television, playing basketball, and listening to music; when he left the shelter, he would visit his grandmother or friends, go on walks, and go to the grocery store. (*Id.*).

During the evaluation, Plaintiff reported a "sad mood and lack of motivation at times due to 'life circumstances.'" (R. 589).  He denied suicidal or homicidal intent or plan in the thirty days prior to the evaluation, and said he experienced no other anxiety symptoms, trauma, panic attacks, or mania. (*Id.*).  Plaintiff reported a history of "random" auditory hallucinations and that he last heard a voice about a year prior to the evaluation, but said his symptoms were well controlled with medication. (*Id.*).  He reported drinking alcohol four to five times a week, but no other drug use. (*Id.*).  Plaintiff also told Dr. Rosenfeld about his legal history, including charges for assault, disorderly conduct, domestic violence, and possession of paraphernalia. (*Id.*).  The possession of paraphernalia matter was not resolved "because he keeps missing the court date." (*Id.*).

During the examination, Plaintiff presented as "cooperative, with fair social skills." (*Id.*).

He appeared to be dressed appropriately, had satisfactory hygiene, normal posture and motor behavior, and maintained appropriate eye contact. (*Id.*). He was coherent and Dr. Rosenfeld observed no evidence of hallucinations, delusions, or paranoia. (*Id.*). Dr. Rosenfeld noted that Plaintiff's affect was "constricted," and his attention and concentration were "mildly impaired." (R. 589-90). Plaintiff could do basic counting and simple calculations, but performed serial sevens with two errors.[6] (R. 590). He recalled 3/3 objects immediately and after a delay. (*Id.*). In addition, he could count seven digits forward and three digits backwards. (*Id.*). Overall, Dr. Rosenfeld assessed Plaintiff's intellectual functioning as average. (*Id.*).

Dr. Rosenfeld diagnosed Plaintiff with schizophrenia and an alcohol use disorder. (R. 591). He rated Plaintiff's prognosis as "fair, given the chronicity of his symptoms." (*Id.*). Dr. Rosenfeld concluded that Plaintiff showed no evidence of limitation in (1) understanding, remembering, or applying simple directions and instructions, (2) using reason and judgment to make work-related decisions; (3) sustaining concentration and performing tasks at a consistent pace; (4) sustaining an ordinary routine and regular attendance at work; (5) maintaining personal hygiene and appropriate attire; and (6) being aware of normal hazards and taking appropriate precautions. (R. 590-91). He opined that Plaintiff had mild limitations in understanding, remembering, or applying complex directions and instructions. (R. 590). He also opined that Plaintiff had moderate limitations in interacting adequately with supervisors, co-workers, and the public; and in regulating emotions, controlling behavior, and maintaining well-being. (R. 590-91). He stated that Plaintiff's difficulties were "caused by his psychiatric diagnosis," and that his psychiatric problems "may interfere with [Plaintiff's] ability to function on a daily basis." (R. 591). Dr. Rosenfeld recommended that Plaintiff continue with psychiatric treatment and

---

[6] "Serial threes" and "serial sevens" are clinical tests of mental function in which a patient is asked to count down from 100 by subtracting by three and seven, respectively.

consider engaging in individual psychotherapy. (*Id.*). He concluded that Plaintiff would need assistance to manage funds due to his recent substance abuse. (*Id.*).

### 4. Dr. Jisu Han, D.O.

On June 20, 2023, Plaintiff had a new patient physical exam with Dr. Jisu Han, D.O. (R. 595-98). His mother was present for the evaluation, and told Dr. Han that Plaintiff had a "long history of mental health difficulties." (R. 595). Plaintiff reported gaining 83 pounds since being diagnosed with schizophrenia in August 2022. (*Id.*). Plaintiff told Dr. Han that he lives in a shelter, but does not like being there so he often went to his grandmother's apartment to eat and sleep, and was also "'on the street' a lot." (R. 596). At the time of the examination, Plaintiff reported that his psychiatrist did not feel it was appropriate for him to be working, but that he was seeking work. (*Id.*). Dr. Han found Plaintiff to be "alert and oriented," with "normal speech, good eye contact, [and] flat affect and voice." (R. 597). He noted that Plaintiff expressed interest in an adult day program and therapy, and that he was applying for disability benefits. (R. 598). Plaintiff had a follow-up appointment with Dr. Han on July 11, 2023 to discuss his lab results. (R. 599-610). Dr. Han diagnosed Plaintiff with Vitamin D deficiency, mixed hyperlipidemia, and schizophrenia. (R. 602). He recommended Plaintiff make certain dietary and lifestyle changes to manage his symptoms. (*Id.*).

### 5. Dr. Michael Martin, Psy.D.

On August 17, 2023, Plaintiff had a psychiatric consultative examination with Dr. Michael Martin, Psy.D. (R. 626-30). Dr. Martin's report reflects that Plaintiff completed high school and did two semesters of college before dropping out due to poor grades. (R. 626). Plaintiff said he last worked as a busboy for six months in 2017, but stopped working when the business was sold. (*Id.*). He told Dr. Martin that he was unable to work due to his recent

schizophrenia diagnosis. (*Id.*).  Plaintiff reported three prior hospitalizations. (*Id.*).  He said he had been seeing Dr. Gonzalez-Aviles for monthly therapy for about a year. (R. 627).  He did not report any other mental health treatment or medications other than Risperdal. (*Id.*).

At the time of his evaluation, Plaintiff split his time between a shelter and his grandmother's home. (R. 626).  He could dress, bathe, and groom himself, cook and prepare food, clean, do laundry, shop, manage money, and take public transportation. (R. 629).  Plaintiff reported having good relationships with his friends and family. (*Id.*).  His hobbies included interacting with friends, socializing and being out of the house, watching television, listening to music, playing video games, and playing sports. (*Id.*).  He typically spent time with his friends (at home, at the park, or out in general), or at home watching television. (*Id.*).

During the evaluation, Plaintiff reported depressive symptoms including "some loss of interest in activities, diminished sense of pleasure, and social withdrawal." (R. 627).  He denied suicidal or homicidal intent or plan in the thirty days prior to the evaluation, and said he experienced no anxiety symptoms or triggers, trauma, or panic attacks. (*Id.*).  Plaintiff denied having any manic symptoms, as well as any history of "auditory and visual hallucinations and all delusions." (*Id.*).  He drank alcohol once or twice a week, and had a history of marijuana use beginning in high school until September 2022. (*Id.*).  Dr. Martin concluded that Plaintiff did not meet the DSM-5 criteria for a substance use disorder, despite occasional drug and alcohol use. (*Id.*).  Plaintiff also told Dr. Martin that he was arrested in October 2022 after violating a restraining order. (*Id.*).

During the examination, Plaintiff's "demeanor and responsiveness to questions was cooperative." (*Id.*).  He was dressed "neatly and appropriately," and his posture, motor behavior, and eye contact were "normal and appropriate." (R. 628).  He was coherent and Dr. Martin

observed no evidence of hallucinations, delusions, or paranoia. (*Id.*).  Dr. Martin noted that Plaintiff's affect was "slightly restricted, but overall of full range and appropriate to speech and thought content." (*Id.*).  Plaintiff's attention and concentration were "intact," and he could do basic counting and simple calculations. (*Id.*).  He completed serial sevens with one error (which he corrected) and serial threes without error. (*Id.*).  He recalled 3/3 objects immediately and after a delay, and could count seven digits forward and four digits backwards. (*Id.*).  Overall, Dr. Martin assessed Plaintiff's intellectual functioning as average, and his insight and judgment as fair. (R. 628-29).

Dr. Martin diagnosed Plaintiff with an unspecified depressive disorder. (R. 630).  He rated Plaintiff's prognosis as "good." (*Id.*).  Dr. Martin concluded that Plaintiff showed no evidence of limitation in (1) understanding, remembering, or applying simple (or complex) directions and instructions; (2) using reason and judgment to make work-related decisions; (3) sustaining concentration and performing tasks at a consistent pace; (4) sustaining an ordinary routine and regular attendance at work; (5) maintaining personal hygiene and appropriate attire; and (6) being aware of normal hazards and taking appropriate precautions. (R. 629).  He opined that Plaintiff had mild limitations in (1) interacting adequately with supervisors, co-workers, and the public; and (2) regulating emotions, controlling behavior, and maintaining wellbeing. (*Id.*). He also stated that Plaintiff's difficulties were "caused by depressive or manic symptoms of bipolar disorder when present." (*Id.*).  While the results of Plaintiff's examination were "consistent with psychiatric problems," Dr. Martin concluded that this alone "[did] not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis." (*Id.*).  Dr. Martin recommended that Plaintiff continue with psychological and psychiatric treatment. (R. 630).  He also concluded that Plaintiff would not need assistance managing his own funds. (*Id.*).

### 6. Dr. O. Fassler, Ph.D. and Dr. L. Haus, Psy.D.

On May 2, 2023, psychiatric consultant Dr. O. Fassler, Ph.D. assessed Plaintiff's residual functional capacity ("RFC"). (R. 61-68).  Dr. Fassler found that with respect to the "paragraph B" criteria, Plaintiff had (i) no limitations understanding, remembering, or applying information, and (ii) moderate limitations interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (R. 63).  The evidence also did not establish the presence of any "paragraph C" criteria. (*Id.*).  Dr. Fassler stated that Plaintiff's medically determinable impairments ("MDI") could have reasonably been expected to produce his alleged symptoms[7]; and that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were "generally consistent with the evidence of record." (R. 64).

Dr. Fassler opined that Plaintiff did not have understanding and memory limitations, but had some limitations relating to sustained concentration and persistence.[8] (R. 65).  He also found that Plaintiff had some limitations with respect to social interaction[9] and adaptation.[10] (*Id.*).  Dr.

---

[7] Specifically, Dr. Fassler said Plaintiff had symptoms related to understanding and memory; sustained concentration and persistence; social interaction; and the ability to adapt. (R. 64).

[8] Specifically, Dr. Fassler found no evidence of limitation in Plaintiff's ability to carry out very short and simple instructions, and to make simple work-related decisions. (R. 65).  He found Plaintiff was not significantly limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to sustain an ordinary routine without special supervisions. (*Id.*).  Last, he determined Plaintiff was moderately limited in his ability to (i) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (ii) work in coordination with or in proximity to others without being distracted by them; and (iii) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*).

[9] Specifically, Dr. Fassler found Plaintiff was markedly limited in his ability to interact appropriately with the general public; and moderately limited in his ability to (i) accept instructions and respond appropriately to criticism from supervisors; (ii) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (iii) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*).  He concluded Plaintiff had no limitations in his ability to ask simple questions or request assistance. (*Id.*).

[10] Specifically, Dr. Fassler found Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (*Id.*).  However, he concluded Plaintiff had no limitations in his ability to be aware of normal hazards, take appropriate precautions, travel in unfamiliar places, or use public transportation. (*Id.*).

Fassler concluded that Plaintiff "retain[ed] the sustained capacity to meet the basic demands of competitive, remunerative, unskilled work including the ability to: understand, carry out and remember simple instructions, respond appropriately to supervision, coworkers and usual work situations and deal with changes in a routine work setting, in a setting with limited interpersonal contact." (R. 66).

Dr. Fassler determined that Plaintiff was not disabled, that he was limited to unskilled work because of his impairments, and that he had no exertional limitations with respect to his maximum sustained work capability. (R. 67). At the reconsideration level, Dr. L. Haus, Psy.D. affirmed Dr. Fassler's decision. (R. 70-78).

## B. Nonmedical Evidence

### 1. Plaintiff's Testimony

During the May 30, 2024 hearing, Plaintiff was represented by counsel. (R. 28). He stated that the highest level of education he completed was two semesters of community college. (R. 48). In high school, he was in a "flex" program with a smaller group of students that received one-on-one attention and extra help. (R. 48-49). Plaintiff had some "issues" in high school which he was evaluated for, which "affected [his] attitude." (R. 49).

Plaintiff testified that he was diagnosed around September 2022 with several psychiatric ailments (schizophrenia, depressive disorder, attention deficit disorder ("ADD"), bipolar disorder and an impulse control disorder), but has been medicated since he was younger. (R. 37). He reported taking risperidone since 2022, and stated that the medication has side effects including dryness of mouth, heaving, and weight gain. (R. 38). Plaintiff said he remembers to take the medicine and to get it refilled as needed. (R. 40). He explained that his obesity affects his breathing and ability to walk long distances, and reported short-term memory problems. (R. 39,

42-43).  When questioned by the ALJ about socializing with other people, Plaintiff said he is "socially awkward and slightly introverted at times," and may have some anxiety being out in public with other people around him, but it is "not something [he] can't bear." (R. 40).

Given his ADD, Plaintiff said he can only stand for five-to-ten minutes without needing to change position, pace back and forth, or sit down. (R. 47).  He reported that he can only sit between fifteen-to-twenty minutes because he is a "very fidgety person," and that he can only walk three-to-five blocks before needing to take a break. (R. 47-48).  Plaintiff testified that he can "easily" lift ten-to-fifteen pounds. (R. 48).

Plaintiff stated that "family troubles" led to his emergency room treatment and hospitalizations in 2021 and 2022; during that time he could no longer stay with his family and was homeless living in shelters. (R. 40-42).  Plaintiff also testified that he previously used marijuana, but stopped around 2022-2023, and drinks socially. (R. 43).  He reported that he can get aggravated and aggressive "pretty easily," and that these symptoms occur when he is out socializing or in a store, especially when he "feel[s] misunderstood" or when people are not "willing to ... understand where [he's] coming from." (R. 45).  Plaintiff said he tries not to make his aggression, aggravation, and irritation "a habit," but they are something he deals with. (*Id.*).

With respect to his daily routine, Plaintiff testified that he could do basic activities, but that his grandmother helps him with cooking and laundry. (R. 44).  He testified that, "for the most part," he does not have trouble maintaining attention, concentrating, or focusing on simple activities like watching a thirty-minute television show or playing a game on his phone. (R. 39).  On a typical day, Plaintiff said he walks around his neighborhood, talks to or meets up with friends, and watches sports on television. (R. 46).  Given that he is financially "hindered," he "can[not] go to many social things." (*Id.*).

## 2. Vocational Expert's Testimony

Vocational Expert Susan Moyes ("VE Moyes" or the "VE") testified at Plaintiff's hearing. (R. 50-57).  The ALJ posed a hypothetical to VE Moyes, asking her to assume an individual of Plaintiff's age, education, and work experience, who was limited to medium to sedentary work; who could "perform the full range of work at all exertional levels except the individual can only work at low stress jobs, defined as jobs containing no more than simple routine and repetitive tasks, involving only simple work-related decisions, with no more than occasional workplace changes and where there is only occasional interaction with supervisors, coworkers and/or the general public." (R. 50).  VE Moyes testified that such an individual could work as a cleaner II, 919.687-014, medium exertion, with an SVP 1; routing clerk, 222.687-022, light exertion, with an SVP 2; or merchandise marker, 209.587-034, light exertion with an SVP 2. (R. 51.).[11]  ALJ McCormack then asked VE Moyes to assume the same limitations, except the individual would be limited to no (rather than occasional) interaction with the public. (R. 51-52). VE Moyes testified that such an individual could work in the same jobs she listed for the prior hypothetical, and that there would be no reduction in the number of jobs cited. (R. 52-53).  She clarified that in those jobs, "there can be some public passing by," but that would be "more incidental" and "not a part of the actual requirements of the job[,] which is why [she] would not be reducing numbers." (R. 53).

The ALJ asked VE Moyes a third hypothetical of an individual with the same limitations, plus only being able to "work at jobs allowing the individual to be off task by at least 15% of the day during the course of an eight-hour workday and where the individual will have at least one

---

[11] VE Moyes initially responded to the ALJ's hypothetical by stating that that such an individual could work as a commercial or institutional cleaner, 381.687-014, heavy exertion, with an SVP 2. (R. 51).  However, the ALJ asked VE Moyes to avoid any "heavy jobs" in her testimony and clarified that the first hypothetical should be limited to an individual limited to "medium to sedentary" work. (*Id.*).

unexcused absence per work each month." (*Id.*).  VE Moyes testified that with those limitations, an individual could not work at the jobs she previously cited, and that either limitation "would preclude competitive employment." (*Id.*).  Finally, ALJ McCormack asked VE Moyes to assume an individual with the same limitations as in hypothetical one and two, except instead of the full range of work, the individual would be limited to less than the full range of sedentary work; who could lift or carry ten pounds occasionally; and who could walk for a total of one hour in an eight-hour workday, stand for a total of one hour in an eight-hour workday, and sit for four hours in an eight-hour workday with the remaining four hours allowing for an at will sit/stand option. (R. 54).  The VE testified that "[t]his amount of changing positions and the four-hour maximum of sitting ... would preclude the ability to perform competitively in the sedentary unskilled jobs" she previously listed. (R. 54-55).  VE Moyes confirmed that all her opinions were based upon her professional knowledge and experience. (R. 53-55).

Plaintiff's attorney questioned VE Moyes. (R. 55-57).  Counsel asked if the positions the VE listed would still be available if the individual "were to be late for all those jobs" on a consistent, daily basis. (R. 55).  VE Moyes responded that an employer would not tolerate such absenteeism. (R. 55-56).  Counsel next asked VE Moyes to confirm how many of the jobs she listed were available in the locality where Plaintiff lives, rather than just available in the national economy. (R. 56).  VE Moyes testified that in New York there were approximately 3,030 jobs for the cleaner II position; 5,030 jobs for the routing clerk position; and 7,765 jobs for the marker position. (R. 56-57).

## C.  ALJ McCormack's Decision

On June 5, 2024, ALJ McCormack denied Plaintiff's application. (R. 22).  He determined that Plaintiff had not been under a disability within the meaning of the SSA since September 13,

2022. (*Id.*).  Applying the five-step procedure established by the Commissioner for evaluating

disability claims, ALJ McCormack evaluated Plaintiff's claims. *See* 20 C.F.R. §§ 404.1520(a),

416.920(a); (R. 11-22).  At step one, he found that Plaintiff had not engaged in substantial

gainful activity from September 13, 2022, the alleged disability onset date. (R. 12).  At step two,

ALJ McCormack determined that Plaintiff had the following severe impairments: (1)

schizophrenia; (2) depressive disorder; (3) alcohol use disorder; (4) attention deficit disorder; and

(5) bipolar disorder. (*Id.*).[12]  He determined that these impairments significantly limited

Plaintiff's ability to perform basic work activities. (*Id.*).  At step three, ALJ McCormack found

that Plaintiff did not have an impairment or combination of impairments that met or medically

equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpt. P, App. 1

(20 C.F.R. §§ 416.920(d), 416.925, and 416.926). (R. 13).  Specifically, the ALJ concluded that

the "paragraph B" criteria[13] were not satisfied. (R. 13-15).  In his "paragraph B" analysis, ALJ

McCormack found that Plaintiff had no limitations in understanding, remembering, or applying

---

[12] At step two, ALJ McCormack also considered Plaintiff's non-severe medically determinable impairments. (R. 12-13).  These included Plaintiff's diagnosis of mixed hyperlipidemia, bilateral foot pain, and left shoulder pain. (R. 12).  The ALJ determined that the evidence "[did] not show that these conditions had more than a minimal impact on [Plaintiff's] ability to perform basic work activities," and that "no aggressive treatment was recommended or [was] anticipated for them." (R. 13).  "Without more," ALJ McCormack found that these conditions "[did] not significantly limit [Plaintiff's] ability to perform basic work activities and constitute[d] only non-severe impairments." (*Id.*).

[13] "To satisfy the 'paragraph B' criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis." (*Id.*).

information, and moderate limitations in interacting with others, concentrating, persisting or maintaining pace, and adapting or managing himself. (R. 14).

ALJ McCormack also found that Plaintiff did not establish the "paragraph C" criteria,[14] because Plaintiff "[did] not, on an ongoing basis, rely upon medical treatment, mental health therapy, psychosocial support, or a highly structured setting to diminish the symptoms and signs of [his] mental disorder." (R. 15).  The ALJ concluded that Plaintiff had achieved more than "marginal adjustment" to the demands of daily living, as he could "leave the house to shop for groceries and to socialize with friends and family." (*Id.*).  ALJ McCormack noted that "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process" and that "[t]he mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning." (*Id.*).  Thus, the ALJ's RFC assessment "reflect[ed] the degree of limitation [he] ... found in the 'paragraph B' mental function analysis." (*Id.*).

ALJ McCormack determined that Plaintiff had the residual functional capacity "to perform the full range of work at all exertional levels, except that he can only work at low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work related decisions; with no more than occasional workplace changes; and where there is occasional interaction with supervisors and co-workers, and no interaction with the general public." (*Id.*).

---

[14] "The 'paragraph C' criteria are used to evaluate mental disorders that are 'serious and persistent.'  In order to meet the 'paragraph C' criteria, the claimant must have a medically documented history of the existence of the disorder over a period of at least two years and evidence of both: medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of his mental disorder; and marginal adjustment, characterized by a minimal capacity to adapt to changes in environment or to demands that are not already part of daily life." (R. 15).

In arriving at the RFC, the ALJ examined all of Plaintiff's symptoms and their consistency with the objective medical evidence and other evidence in the record based on the requirements of 20 C.F.R. § 416.929 and SSR 16-3p. (*Id.*).  He "also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c." (*Id.*).  ALJ McCormack followed a "two-step process." (*Id.*).  First, to determine "whether there [was] an underlying medically determinable physical or mental impairment[] ... that could reasonably be expected to produce [Plaintiff's] pain or other symptoms"; and second, upon showing of such an impairment, to "evaluate the intensity, persistency, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit [Plaintiff's] work-related activities." (R. 15-16).  ALJ McCormack additionally considered Plaintiff's statements regarding his mental health, including that (1) "he alleged disability due to attention deficit hyperactivity disorder, oppositional defiant disorder, anxiety, and schizophrenia;" (2) he had "racing and scattered thoughts as a result of his schizophrenia;" (3) he experienced "side effects of sleepiness, slow mindedness, and weight gain" from his psychiatric medications; and (4) since the onset of his impairments, he experienced "social isolation" and a "loss of friendships and relationships." (R. 16).  The ALJ also noted that Plaintiff reported having no problems feeding himself or using the toilet; that he could independently dress, bathe, and groom himself, but needed reminders to do so; and that he could perform some household chores. (*Id.*).  Plaintiff's hobbies and interests included "watching sports on television, playing basketball, and walking." (*Id.*).

The ALJ concluded that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, ... the intensity, persistence and limiting effects of these symptoms [were] not shown by the medical evidence and other evidence in the

record" and "[were] not consistent with the medical signs, laboratory findings, and/or other evidence of record which limit the capacity for work-related activities." (R. 19).

ALJ McCormack summarized the medical evidence in the record that he reviewed. (R. 13-20). He first described Plaintiff's four psychiatric hospitalizations. (R. 16).[15] The ALJ then detailed Plaintiff's history of psychiatric evaluations, including a psychiatry evaluation with Dr. Gonzalez-Aviles on September 20, 2022 and a mental status examination on July 24, 2023; a psychiatric consultative examination with Dr. Rosenfeld on February 10, 2023; a new patient evaluation with Dr. Han on June 20, 2023; and a psychiatric consultative examination with Dr. Martin on August 17, 2023. (R. 16-17). The ALJ also described May 2, 2023 and August 30, 2023 findings from the state's psychiatric consultants, Dr. Fassler and Dr. Haus. (R. 18). Finally, ALJ McCormack explained that he considered Plaintiff's obesity in determining his RFC. (R. 17).

The ALJ also reviewed and weighed the opinion evidence in the record. (R. 17-20). He found Dr. Rosenfeld's opinion persuasive, and factored it into his RFC determination, because "he [was] an impartial consultative examiner, who had the opportunity to examine [Plaintiff]." (R. 18). Additionally, the opinion was persuasive because it was "consistent" with Dr. Rosenfeld's examination, and with the opinions of the state agency medical consultants. (*Id.*). Specifically, Dr. Rosenfeld opined that Plaintiff had "mild limitation in his ability to understand, remember, or apply complex directions and instructions," and "moderate limitation in his ability to interact adequately with supervisors, co-workers, and the public; and to regulate emotions, control behavior, and maintain well-being." (R. 17). Dr. Rosenfeld concluded that Plaintiff "had

---

[15] Plaintiff was admitted to Paramus Hospital in 2008 and stayed for ten days because of aggressive behavior. (R. 16). He was admitted to University Hospital from January 31, 2022 to February 4, 2022 for psychosis, and admitted to Paramus Health Care System from August 29, 2022 to September 3, 2022 for schizophrenia. (*Id.*). Also in 2022, Plaintiff was admitted to Stony Brook Hospital and treated with risperidone for psychosis. (*Id.*).

psychiatric problems which may interfere with his ability to function on a daily basis." (*Id.*).

ALJ McCormack similarly found Dr. Martin's opinion generally persuasive "because he [was] an impartial consultative examiner, who had the opportunity to examine Plaintiff," and because it was "supported by, and consistent with" his examination of Plaintiff, which "revealed only slightly restricted affect, and mildly impaired recent and remote memory skills." (R. 18). Dr. Martin's opinion was additionally consistent with other psychiatric evidence in the record and the opinions of the state agency consultants. (*Id.*). Dr. Martin opined that Plaintiff's psychiatric problems "did not appear to be significant enough to interfere with his ability to function on a daily basis." (*Id.*) However, the ALJ found unpersuasive the part of Dr. Martin's opinion stating that Plaintiff only had "mild" social limitations, as this finding was inconsistent with Dr. Rosenfeld's and Dr. Gonzalez-Aviles' opinions, "both of which reflect[ed] that [Plaintiff] has moderate social limitations." (*Id.*).

ALJ McCormack found the state agency medical consultants' opinions persuasive "due to the doctors' psychiatric specialties." (*Id.*). Additionally, he noted that Dr. Fassler's opinion, affirmed by Dr. Haus, was "supported by, and consistent with, the rest of the psychiatric evidence of record." (*Id.*). Specifically, Dr. Fassler concluded that Plaintiff "had no limitation in his ability to understand, remember, or apply information," and "moderate limitations in his ability to interact with others; concentrate; persist, or maintain pace; and adapt or manage [himself]." (*Id.*). Dr. Haus "assessed identical limitations." (*Id.*).

ALJ McCormack also found Dr. Gonzalez-Aviles' opinion persuasive "because it [was] supported by, and consistent with, the clinical findings in his treatment records of [Plaintiff]," as well as "with the preponderance of the rest of the psychiatric evidence of record." (R. 19). Dr. Gonzalez-Aviles concluded that Plaintiff had "moderate limitations in his ability to make

judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, interact appropriately with supervisors(s), interact appropriately with co-workers, and respond appropriately to usual work situations and to changes in a routine work setting." (R. 18-19).

As discussed, *supra*, ALJ McCormack concluded that "the nature, intensity, persistence, and limiting effects" of Plaintiff's symptoms, including pain, were "not consistent with the medical signs, laboratory findings, and/or other evidence of record which limit the capacity for work-related activities." (R. 19). First, the ALJ explained that Plaintiff "described a reasonably broad range of daily activities, which do not evince disabling symptoms and limitations." (*Id.*). These included Plaintiff's ability to dress, bathe, and groom himself, cook and prepare food, clean and do laundry, manage money, and take public transportation. (*Id.*). Plaintiff also reported good relationships with four to five friends, and that he watches sports and television, listens to music, uses a cell phone for texting and phone calls, and plays video games and sports. (*Id.*). He "typically spends his time either interacting with his friends, at home or at the park or out in general, or at home watching television." (*Id.*). ALJ McCormack determined that "such abilities ... show[ed] a greater residual functional capacity than alleged." (*Id.*).

Second, "although [Plaintiff had] received treatment for his impairments," the ALJ found that the treatment was "essentially routine and conservative." (*Id.*). Of note, Plaintiff "[had] not been enrolled in any mental health treatment program and [did] not undergo therapy. Instead, he only visit[ed] a psychiatrist monthly for medication management." (*Id.*). Finally, the ALJ concluded that the record "[did] not contain any specific function-by-function work assessments from any treatment provider indicating any greater limits" than the RFC he determined. (*Id.*).

"For all these reasons, the clinical and longitudinal evidence of record [did] not support the extent of the limitations alleged." (R. 20).  Instead, ALJ McCormack concluded that the "persuasive opinions rendered" and "the totality and preponderance of the psychiatric evidence" supported his RFC finding, including the fact that each of Plaintiff's "inpatient treatments [where he was twice treated at an emergency department and psychiatrically hospitalized multiple times] involved non-compliance with medication, and one was for substance abuse." (*Id.*).[16]  Moreover, the ALJ found that "the remainder of [Plaintiff's] objective psychiatric findings apart from [these] treatment[s] have been normal and unremarkable." (*Id.*).  ALJ McCormack concluded that Plaintiff's inpatient and emergency room treatment "[was] not of a frequency, or a duration, that objectively show[ed] any greater psychiatric limitations than those outlined within [Plaintiff's] above found residual functional capacity." (*Id.*).

At step four, the ALJ stated that Plaintiff had no past relevant work. (R. 21).  At step five, considering Plaintiff's age, which qualified him as a younger individual, his limited education, the transferability of job skills, which was not an issue because Plaintiff did not have past relevant work, and RFC, the ALJ found that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (*Id.*).  Thus, the ALJ concluded that Plaintiff "has not been under a disability ... [since] September 13, 2022." (R. 22).

---

[16] Specifically, Plaintiff received treatment from an emergency department on November 29, 2021, where "it was noted that he did not meet the criteria for an Axis I disorder" and that he was non-compliant with medical orders. (R. 20).  On December 29, 2021, the emergency department diagnosed Plaintiff with bipolar disorder and adult attention deficit disorder, and again noted his non-compliance with prescribed medications. (*Id.*).  Plaintiff's treatment notes from his January 29, 2022 to February 4, 2022 psychiatric hospitalization "reflect[ed] a diagnosis of substance induced psychosis" and that he "refused psychiatric medications." (*Id.*).  "During a psychiatric hospitalization lasting from August 19, 2022 through September 8, 2022, [Plaintiff] was diagnosed with schizoaffective disorder; his non-compliance was again noted." (*Id.*).

## II. DISCUSSION

Plaintiff argues that ALJ McCormack's decision should be reversed and remanded for further administrative proceedings because (1) the ALJ "failed to properly evaluate all of [Plaintiff's] severe impairments[;]" and, subsequently, (2) "failed to narrowly tailor [Plaintiff's] residual functional capacity to those impairments, resulting in jobs suggested by the vocational expert which did not conform to his capabilities." (Pl. Br. at 5).  Thus, the ALJ's decision "is not supported by substantial evidence and is tainted by legal error." (*Id.*).  The Commissioner maintains that ALJ McCormack (1) "properly assessed [Plaintiff's] alleged impairments" based on the relevant evidence of record; and (2) his "RFC determination was supported by substantial evidence." (Comm'r Br. at 6).

### A.  Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (*per curiam*) (quoting 42 U.S.C. § 423(d)(1)(A)).  The Social Security Administration ("Administration") has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (*per curiam*).

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review is "limited to determining whether the [Administration's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put another way, a conclusion must be buttressed by "more than a mere scintilla" of record evidence. *Id*. (quoting *Consol. Edison*, 305 U.S. at 229).  The substantial evidence standard is "very deferential" to the ALJ. *Brault*, 683 F.3d at 448.  The Court does not substitute its judgment for the agency's "or 'determine *de novo* whether [the claimant] is disabled.'" *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of

the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*

On January 18, 2017, the Administration considerably revised its regulations for evaluating medical evidence.  The rules went into effect on March 27, 2017, and therefore, apply to the instant case.  Under the new regulations, the treating physician rule no longer applies. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Consequently, no special deference is given to the treating physician's opinion. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, "[the Commissioner] will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  The updated regulations also define a "medical opinion" as "a statement from a medical source about what [the claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions ...." 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  Thus, a medical opinion must discuss both a claimant's limitations and "what [the claimant] is still capable of doing" despite those limitations. *Michael H. v. Saul*, 5:20-CV-417 (MAD), 2021 WL 2358257, at *6 (N.D.N.Y. June 9, 2021).  Relatedly, conclusory statements by a claimant's provider concerning issues reserved to the Commissioner – for instance, whether the claimant is disabled under the SSA – are "inherently neither valuable nor persuasive" and will not be analyzed by the ALJ. 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

## B.  The ALJ's Duty to Develop the Record

As a threshold matter, the Court must be satisfied that the record is fully developed

before determining whether the Commissioner's decision is supported by substantial evidence. *See Smoker v. Saul*, 19-CV-1539 (AT)(JLC), 2020 WL 2212404, at *9 (S.D.N.Y. May 7, 2020) ("Whether the ALJ has satisfied this duty to develop the record is a threshold question."). "[I]n light of the 'essentially non-adversarial nature of a benefits proceeding[,]'" "[a]n ALJ, unlike a judge at trial, has an affirmative duty to develop the record." *Vega v. Astrue*, No. 08 Civ. 1525 (LAP)(GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). "This duty is present even when a claimant is represented by counsel[.]" *Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004) (summary order). "Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence" is appropriate. *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d. Cir. 1996)); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order).

Here, the Court finds no obvious gaps in the record. There are hundreds of pages of medical treatment records, medical opinions from Plaintiff's treating providers and the consultative examiners, records from the disability examiner, and the hearing records. *See supra* Section I. Moreover, Plaintiff does not dispute that the record was fully developed, and Plaintiff's counsel confirmed the same at the May 2024 hearing. (R. 34-35).

Accordingly, the Court finds that ALJ McCormack fulfilled his duty to develop the record.

## C.  The ALJ's Residual Functional Capacity Determination

ALJ McCormack determined that Plaintiff had the RFC "to perform the full range of work at all exertional levels, except that he can only work at low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work related decisions; with no more than occasional workplace changes; and where there is occasional interaction with supervisors and co-workers, and no interaction with the general public." (R. 15). The ALJ acknowledged that Plaintiff's ability to perform work at all exertional levels was "compromised by nonexertional limitations," but found he was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" for an individual of comparable age, education, work experience, and RFC, including as a cleaner II, routing clerk, or merchandise marker. (R. 21-22).

Plaintiff argues that ALJ McCormack erred in his RFC assessment for two reasons: (1) the ALJ "failed to properly evaluate [Plaintiff's] intermittent explosive disorder as a severe impairment as required by federal regulation"; and (2) the ALJ's RFC determination "[was] not supported by substantial evidence as it [did] not properly accommodate for [Plaintiff's] limitations interacting with coworkers and supervisors." (Pl. Br. at 21, 24).  The Commissioner maintains that ALJ McCormack's step two and RFC determinations were supported by substantial evidence, thus his decision is "free of legal error." (Comm'r Br. at 12).

The Court "conduct[s] a plenary review of the administrative record to determine whether, considering the record as a whole, the Commissioner's decision is supported by substantial evidence." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citation omitted). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the Court] will not substitute [its] judgment for that of the

Commissioner." *Id.* The ALJ must weigh all of the available evidence to make an RFC determination that is consistent with the record. *See Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 225 (E.D.N.Y. 2021) (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order)).

"The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by his impairments." *Selian*, 708 F.3d at 418 (citing 20 C.F.R. § 404.1545). "The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 640 (S.D.N.Y. 2019) (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)); *see also Weather v. Astrue*, 32 F. Supp. 3d 363, 376 (N.D.N.Y. 2012) (When determining the RFC, the ALJ considers "a claimant's physical abilities, mental abilities, [and] symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis.") (citing 20 C.F.R. § 404.1545(a)). "[T]he RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence." *Glessing v. Comm'r of Soc. Sec.*, No. 13 Civ. 1254 (BMC), 2014 WL 1599944, at *8 (E.D.N.Y. Apr. 21, 2014) (quoting *Wichelns v. Comm'r of Soc. Sec.*, No. 5:12-CV-1595 (NAM)(ATB), 2014 WL 1311564, at *6 (N.D.N.Y. Mar. 31, 2014)) (internal quotations omitted). The RFC determination is reserved to the Commissioner. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) (summary order). When the RFC is supported by substantial evidence in the record, the Court will uphold it. *See Zacharopoulos*, 516 F. Supp. 3d at 226 (citing *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order)).

The Commissioner may also consider a claimant's daily activities in the RFC analysis. *See Perez-Rodriguez v. Astrue*, No. 10 Civ. 9346 (NRB), 2011 WL 6413763, at \*5 (S.D.N.Y. Dec. 21, 2011); *see also* 20 C.F.R. § 404.1512(b).  Courts in the Second Circuit have held that an individual's ability to complete basic daily activities "does not, in itself, contradict a claim of disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'" *Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174 (ENV)(MDG), 2011 WL 1004696, at \*5 (E.D.N.Y. Mar. 18, 2011) (quoting *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000)).  Nevertheless, the regulations state that the Commissioner will consider Plaintiff's daily activities as one factor in determining the severity of Plaintiff's impairments. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## 1.  Step Two Analysis

Plaintiff asserts that ALJ McCormack erred in failing to address (i) his intermittent explosive disorder when determining his severe and non-severe impairments at the second step of the disability determination; and (ii) "how the violent behavior that accompanies this disorder might affect his ability to function in a work environment." (Pl. Br. at 21-22).  Thus, if the ALJ had "properly evaluated" the disorder as a severe impairment at step two, "he would have created an RFC limiting [Plaintiff's] exposure to situations likely to lead to explosive episodes." (*Id.* at 24).  The Commissioner maintains that Plaintiff's argument is "unavailing" because ALJ McCormack "explicitly discussed Plaintiff's history of difficulty appropriately regulating his emotions when making the step-two and RFC determinations." (Comm'r Br. at 12).

"The Second Circuit has held that Step Two should only be used to 'screen out de minimis claims.'" *Spina v. Colvin*, No. 5:11-CV-1496, 2014 WL 502503, at \*4 (N.D.N.Y. Feb. 7, 2014) (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)).  "At step two, the ALJ is

required to 'consider the medical severity of [the claimant's] impairment(s).'" *Girao v. Kijakazi*, 22-CV-1419 (JLC), 2023 WL 5312064, at *11 (S.D.N.Y. Aug. 18, 2023) (alteration in original) (quoting 20 C.F.R. § 404.1520(a)(4)(ii)); *see also Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (Step two requires the Commissioner to "determine whether the claimant has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities."). "In the case of a claimed mental impairment, the severity determination must also include the 'special technique' set forth in § 404.1520a(b)-(e)." *Girao*, 2023 WL 5312064, at *11.[17] "The analyses of impairments when determining severity at step two and when later formulating the claimant's RFC are related but distinct," and "an ALJ's assessment at step two [does] not relieve [them] of the requirement to discuss Plaintiff's mental health impairments in formulating the RFC." *Coulter v. Comm'r of Soc. Sec.*, 673 F. Supp. 3d 365, 375-76 (S.D.N.Y. 2023) (internal quotations and citation omitted). "[W]hen there are multiple impairments ..., and the ALJ finds some but not all to be severe, an error at Step Two is harmless because the ALJ continues with the analysis and does not deny the disability application based on the lack of a severe impairment alone." *Spina*, 2014 WL 502503, at *4. Further, "the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Seth Adam P. v. Comm'r of Soc. Sec.*, 7:24-cv-02684 (GRJ), 2025 WL 936929, at *3 (S.D.N.Y. Mar. 27, 2025) (quoting *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)); *see also Taylor*, 32 F. Supp. 3d at 266.

---

[17] "The 'special technique' proceeds as follows: the ALJ (1) 'evaluate[s the] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant] ha[s] a medically determinable mental impairment, 20 C.F.R. § 404.1520a(b)(1); (2) 'rate[s] the degree of functional limitation resulting from the impairment(s),' § 404.1520a(b)(2); and (3) 'determine[s] the severity of [the] mental impairment(s).' § 404.1520a(d)." *Girao v. Kijakazi*, 22-CV-1419 (JLC), 2023 WL 5312064, at *11 n.3 (S.D.N.Y. Aug. 18, 2023) (alterations in original).

At step two of the RFC analysis, ALJ McCormack concluded that Plaintiff's severe impairments were: (1) schizophrenia; (2) depressive disorder; (3) alcohol use disorder; (4) attention deficit disorder; and (5) bipolar disorder. (R. 12).  The ALJ conducted both the severity and "special technique" analysis for these impairments, finding that Plaintiff's mental disorders did not satisfy either the "paragraph B" or "paragraph C" criteria. (R. 13-15).  However, ALJ McCormack noted that his RFC determination "reflect[ed] the degree of limitation [he] found in the 'paragraph B' mental function analysis." (R. 15).

Nevertheless, Plaintiff contends the ALJ should also have found his IED to be a severe impairment. (Pl. Br. at 21).  As a preliminary matter, the existence of an MDI "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521.  The MDI "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," and the Administration "will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment[]." *Id.*; *see also* SOCIAL SECURITY ADMINISTRATION, *Program Operations Manual System (POMS): DI 24501.020 Establishing a Medically Determinable Impairment (MDI)*, https://secure.ssa.gov/poms.nsf/lnx/0424501020 (last visited May 15, 2026) (hereinafter "DI 24501.010") ("We do not consider non-objective medical evidence sufficient to establish an MDI, such as: medical opinions, judgments about the nature and severity of an impairment(s), medical history, diagnosis, prescribed treatment, or prognosis.").

In arguing that the ALJ should have considered Plaintiff's IED to be a severe impairment, Plaintiff largely focuses on subjective evidence with respect to his mental health history, including "incidents of disobedient and defiant behavior in high school," numerous arrests and

hospitalizations for "erratic and violent behavior," his mother's reports of Plaintiff's violence towards his family, and Plaintiff's own testimony. (Pl. Br. at 22-23).  Plaintiff undoubtedly suffers from mental health issues, but under Administration regulations the ALJ cannot diagnose Plaintiff with an MDI of intermittent explosive disorder based only on his history and reported symptoms. *See* 20 C.F.R. § 404.1521.  Moreover, while Dr. Gonzalez-Aviles assessed Plaintiff had IED at their first and second appointments on September 20, 2022, (R. 586), and October 18, 2022, (R. 651), the doctor does not mention the disorder in any notes from Plaintiff's subsequent monthly follow-up appointments.  In fact, at the October 2022 appointment Dr. Gonzalez-Aviles opined that Plaintiff's intermittent explosive disorder "[s]eems in control." (R. 651).  The only other time Dr. Gonzalez-Aviles mentioned a diagnosis of intermittent explosive disorder is on Plaintiff's Psychiatric Medical Report, dated July 24, 2023. (R. 618).  Therefore, ALJ McCormack cannot be expected to diagnose Plaintiff with IED at step two, or to determine that the IED is severe, when – aside from Dr. Gonzalez-Aviles – no other provider, treating physician, or consultative examiner in the record mentioned Plaintiff having this diagnosis.

Further, this is the first time Plaintiff explicitly mentions having IED, and Plaintiff did not allege he had the disorder during his hearing testimony.  "No error occurs when an ALJ fails to identify a severe impairment that a plaintiff did not mention either when applying for benefits or during the administrative hearing." *William E. v. Comm'r of Soc. Sec.*, 24-CV-07186 (AT)(HJR), 2025 WL 2403624, at *11 (S.D.N.Y. July 25, 2025); *see also Seth Adam P.*, 2025 WL 936929, at *4 (finding no error in the step two analysis where plaintiff "did not allege an intellectual disability or personality disorder either in his application for benefits or during his hearing testimony.") (internal citations omitted); *Stephen A. v. Comm'r of Soc. Sec.*, 1:19-CV-1679 (CJS), 2021 WL 1099617, at *4 (W.D.N.Y. Mar. 23, 2021) (finding no step two violation

where "Plaintiff did not allege the impairment in his original disability application, the impairment is not mentioned in the report of the consultative medical examiner, Plaintiff's counsel did not mention the impairment in his opening statement before the ALJ, and there [were] no updated treatment notes to suggest [the impairment] [was] an ongoing or functionally limiting impairment.") (internal citations and quotations omitted).  In Plaintiff's initial disability application filed on September 13, 2022, he alleged disability and inability to work due to attention deficit hyperactivity disorder, oppositional defiant disorder, anxiety, and schizophrenia. (R. 16, 181).  The Court acknowledges that Plaintiff's disability application was filed seven days before the first mention of IED appeared in his record, at the September 20, 2022 appointment with Dr. Gonzalez-Aviles. (*See* Pl. Reply at 7).  Nonetheless, Plaintiff's argument that "he could not be expected to have listed a disabling condition before he had been diagnosed with it" falls flat, given that in the instant application Plaintiff points to his medical history, symptoms, and incidents dating back to high school to argue that the ALJ should have also considered intermittent explosive disorder a severe impairment. (*Id.*; Pl. Br. at 22-23).  Notably, other than Dr. Gonzalez-Aviles, none of the other doctors or consultative examiners mentioned IED as one of Plaintiff's mental health impairments.

Plaintiff also maintains that while he did not raise the disorder at his hearing, he "has frequently denied or downplayed his psychological symptoms, despite the fact that ... his record as a whole includes a 'robust history of significant objective psychiatric symptoms [and] emergency inpatient hospitalizations.'" (Pl. Reply at 7) (quoting *Rucker v. Kijakazi*, 48 F.4th 86, 93 (2d Cir. 2022)).  In *Rucker*, one reason the ALJ denied the claimant's disability application was because she frequently denied experiencing psychiatric symptoms. 48 F.4th at 93.  The Second Circuit overturned the ALJ's decision, finding it was improper to discount the treating

doctor's opinion and diagnosis of Rucker's bipolar diagnosis due to Rucker's own limited insight "into her mental illness, which provide[d] an entirely plausible medical explanation for her frequent denials that she [was] experiencing psychological symptoms." *Id.*  Here, although Plaintiff has a history of significant psychiatric symptoms and emergency inpatient hospitalizations, *see id.*, there is no medical evidence in the record explicitly tying his symptoms to IED.  This differs from *Rucker*, where the claimant's symptoms were clearly linked to her objective medical diagnosis of bipolar disorder. *Id.* at 93-94.

Next, Plaintiff cites to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") to describe clinical symptoms of intermittent explosive disorder, and states that "a diagnosis of IED requires that an individual's aggressive outbursts not be better explained by another mental disorder." (Pl. Reply at 5) (internal citation omitted).  Plaintiff then asserts that he has the specific IED symptom of "sudden, aggressive outbursts due to minor provocation by others," and that he "has significant history that aligns with the diagnostic criteria of [IED]." (*Id.* at 6, 9).  He bases this assertion on the "extremes" of his behavior, including his testimony of being sensitive to, and triggered by, any form of disrespect, (*id.* at 6), as well numerous instances of "repeated, sudden episodes of impulsive, aggressive, violent behavior or angry verbal outbursts" that have caused him "significant distress [and] negatively impact[ed] [his] relationships, work and school," *Jordan v. Berryhill*, 17-cv-06710 (DF), 2019 WL 1448087, at *1 n.3 (S.D.N.Y. Mar. 20, 2019) (internal quotations and citations omitted); (Pl. Br. at 22).  However, Plaintiff does not definitively demonstrate that the symptoms are not related to any of his other severe impairments, such as schizophrenia or bipolar disorder.  Plaintiff maintains "there is no compelling evidence in the record that [he] does not have IED," (Pl. Reply at 8), but is effectively asking the ALJ and the Court to infer, based on his own application of the DSM-V

and without additional "medically acceptable clinical and laboratory diagnostic" evidence, 20 C.F.R. § 404.1521, that he does.  The Administration "will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment[]," *id.*, thus, ALJ McCormack cannot diagnose Plaintiff with an MDI of intermittent explosive disorder based only on Plaintiff's own judgments about the nature and severity of his impairment, *see* DI 24501.010.  Therefore, the ALJ did not err by not finding Plaintiff's asserted IED to be a severe impairment.

Finally, assuming, *arguendo*, that ALJ McCormack should have established IED as one of Plaintiff's medically determinable impairments, his failure to find the impairment severe is harmless error.  "[B]ecause the ALJ found that [P]laintiff had [other severe mental health impairments], he continued to consider [P]laintiff's disability under Steps Three through Five of the disability analysis." *Spina*, 2014 WL 502503, at *4.  Moreover, the ALJ "specifically considered [symptoms relating to Plaintiff's asserted IED] as part of the RFC determination," *Michael B. v. Saul*, 8:19-CV-507 (DJS), 2020 WL 5709179, at *4 (N.D.N.Y. Sept. 24, 2020), including Plaintiff's "record of aggressive behavior" and "difficulty getting along with authority figures," as well as "family, friends, neighbors, or others[,] ... when he is manic." (R. 14; *see also* Comm'r Br. at 12-13).  Therefore, "[e]ven if the ALJ had erred by excluding [intermittent explosive disorder] from the list of severe impairments, such error would be harmless." *Michael B.*, 2020 WL 5709179, at *4 ("The failure to find a specific impairment severe at Step Two is harmless where (a) the ALJ concludes there is at least one severe impairment, (b) the ALJ continues with the sequential evaluation, and (c) the ALJ provides an explanation showing he adequately considered the evidence related to the impairment that is ultimately found non-

severe."); *see also Spina*, 2014 WL 502503, at *4; *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order).

Accordingly, ALJ McCormack's failure to include Plaintiff's alleged intermittent explosive disorder as a severe impairment at step two is not a basis for remand.

## 2. Substantial Evidence

Plaintiff argues that ALJ McCormack's RFC determination is not supported by substantial evidence because he did not "properly accommodate" Plaintiff's limitations interacting with, and responding appropriately to, supervisors and coworkers due to his asserted IED. (Pl. Br. at 24-25). The Commissioner maintains that the ALJ "addressed Plaintiff's emotional issues by including relevant limitations in the RFC," and that Plaintiff "ignores the evidence discussed by the ALJ establishing that Plaintiff's mental limitations were not as limiting as he alleges." (Comm'r Br. at 14).

"[C]onsidering the record as a whole," the Court cannot conclude that the ALJ's RFC determination fully accounted for all of Plaintiff's mental health impairments. *Veino*, 312 F.3d at 586. "[B]ased on all of the relevant medical and other evidence in the record," *Rivera*, 368 F. Supp. 3d at 640, the ALJ had a duty to consider whether Plaintiff's psychiatric symptoms – in particular those related to "sudden episodes of impulsive, aggressive, violent behavior or angry verbal outbursts" – might require additional limitations in a work setting, *Jordan*, 2019 WL 1448087, at *1 n.3.

In his step two analysis, ALJ McCormack noted Plaintiff's "record of aggressive behavior and non-compliance with his homeless shelter's mask regulations, leading to police being called and [Plaintiff's] subsequent arrest," "difficulty getting along well with authority figures," and "alleg[ations] that he has problems getting along with family, friends, neighbors, or

- 36 -

others, but only when he is manic." (R. 14). Based on this information, the ALJ concluded that Plaintiff had moderate limitations in interacting with others. (*Id.*). However, this "assessment at step two [did] not relieve [ALJ McCormack] of the requirement to discuss Plaintiff's mental health impairments in formulating the RFC." *Coulter*, 673 F. Supp. 3d at 376 (quoting *Garcia v. Comm'r of Soc. Sec.*, 21-cv-01230 (SDA), 2022 WL 4234555, at *14 (S.D.N.Y. Sept. 14, 2022)).

ALJ McCormack limited Plaintiff's RFC to "low stress jobs" with only "occasional interaction with supervisors and co-workers, and no interaction with the general public." (R. 15). In making his RFC determination, the ALJ considered the opinions of Dr. Gonzalez-Aviles, Plaintiff's treating psychiatrist, and Drs. Rosenfeld, Fassler, and Haus, the consultative examiners, all of whom opined that Plaintiff had moderate limitations in his ability to interact adequately with supervisors, co-workers, and the public. (R. 17-19). ALJ McCormack also acknowledged that Plaintiff was treated at an emergency department twice and "psychiatrically hospitalized multiple times," and that "each of these inpatient treatments involved non-compliance with medication." (R. 20). Yet, the ALJ concluded that Plaintiff's "inpatient and emergency room treatment [was] not of a frequency, or a duration, that objectively show[ed] any greater psychiatric limitations than those outlined" in his RFC. (*Id.*).

However, even if Plaintiff's psychiatric outbursts did not occur with predictable or significant frequency, it is unclear whether ALJ McCormack's RFC determination considered the conditions that triggered Plaintiff's symptoms, or the impact that any – even infrequent – violence, aggression, or psychosis would have on Plaintiff's ability to comport himself in the workplace. "[An] ALJ may find that Plaintiff's mental impairments are inconsequential and, thus, reject the need to incorporate mental limitations in the RFC – but he must explain his reasoning for doing so." *Laura Ann H. v. Saul*, 6:20-CV-397 (TWD), 2021 WL 4440345, at *11

(N.D.N.Y. Sept. 28, 2021); *see also Novas v. Kijakazi*, 22-CV-1020 (MKV)(BCM), 2023 WL

2614362, at *12 (S.D.N.Y. Mar. 8, 2023) ("If the ALJ concludes that the plaintiff's mental

impairments do not require any RFC accommodation, he should clearly explain why."), *report

and recommendation adopted*, 2023 WL 2613550 (S.D.N.Y. Mar. 23, 2023); *Coulter*, 673 F.

Supp. 3d at 376 ("An ALJ may properly determine that mild limitations found during the

Paragraph B analysis do not translate into functional limitations within the RFC.  But an ALJ

must provide a basis for understanding how they made that determination.").

Here, although the ALJ incorporated interaction-related limitations in the RFC to address

Plaintiff's abilities to engage with the public (no interaction), and supervisors and co-workers

(occasional interaction), (R. 15), he still concluded that the "intensity, persistence and limiting

effects of [Plaintiff's] symptoms are not shown by the medical evidence and other evidence in

the record to be disabling under SSA law," (R. 19).  In doing so, ALJ McCormack "refer[red] to

evidence that may bear on [Plaintiff's] mental functioning," *Novas*, 2023 WL 2614362, at *12

(quoting *Garcia*, 2022 WL 4234555, at *14), including his "reasonably broad range of daily

activities,"[18] (R. 19).  However, "such references are insufficient to explain how the ALJ

considered Plaintiff's mental impairments." *Novas*, 2023 WL 2614362, at *12 (quoting *Garcia*,

2022 WL 4234555, at *14); *see also Brown*, 2011 WL 1004696, at *5 (an individual's ability to

complete basic daily activities "does not, in itself, contradict a claim of disability.").  Despite

Plaintiff's ability to carry out some activities of daily living, ALJ McCormack has not provided

the Court with a "basis for understanding" how he formulated Plaintiff's RFC in light of record

---

[18] The ALJ said these activities – "which [did] not evince disabling symptoms and limitations" – included, among others, Plaintiff dressing, bathing, and grooming himself, doing laundry, managing money, taking public transportation, playing basketball, watching sports and television, listening to music, using a cell phone for texting and phone calls, and socializing with his grandmother or friends. (R. 19).

evidence showing Plaintiff's history of noncompliance with medication,[19] poor judgment and limited insight into his psychiatric conditions,[20] history of aggression, violence, and psychosis,[21] and testimony that he is easily aggravated.[22] *Coulter*, 673 F. Supp. 3d at 376.  Further, Dr. Gonzalez-Aviles noted that Plaintiff's main symptoms occurred "when he is off meds and decompensates." (R. 671).  Based on the record evidence, it is also not clear whether the ALJ's

---

[19] The record includes numerous instances where Plaintiff was noncompliant with his medication.  For example, the emergency department that treated Plaintiff on November 29, 2021 said he was non-compliant with medical orders. (R. 20).  On December 29, 2021, the emergency department again noted his non-compliance with prescribed medications. (*Id.*).  Plaintiff's treatment notes from his January 29, 2022 to February 4, 2022 psychiatric hospitalization stated that he "refused psychiatric medications." (*Id.*).  His non-compliance was again observed during a psychiatric hospitalization from August 19, 2022 to September 8, 2022. (*Id.*).  In May 2023, Plaintiff admitted to Dr. Gonzalez-Aviles "that he may forget to take the risperidone 2 days a week," (R. 675), but in July 2023 stated, "that he [was] taking the risperidone daily." (R. 679).  However, in November 2023 Plaintiff told Dr. Gonzalez-Aviles that he had not been taking his medication daily for the past few months, but he now was. (R. 689).  In April 2024, Dr. Gonzalez-Aviles noted "that [Plaintiff] had 3 months of meds here that he never picked up" and it was "[u]nclear why [Plaintiff] state[d] that he [had] enough meds." (R. 698).

[20] In Plaintiff's September 29, 2022 Field Office Disability Report, the Administration's interviewer, J. Lloyd, stated that Plaintiff "did not want me to know that he was diagnosed with Schizophrenia, [his] mother had to force it out of him." (R. 178).  Treatment notes from Plaintiff's December 2021 emergency department admission state he was a "poor historian," (R. 399), that he "denies any acute medical symptoms," and that he "currently exhibits poor judgment[,] insight[, and] impulse control," (R. 403).  Notes from Plaintiff's January to February 2022 psychiatric hospitalization state he had "poor" insight and judgment, and that he "denies [former history] of [bipolar disorder] or other psychiatric illness." (R. 329-30).  Notes from his August 2022 psychiatric hospitalization state Plaintiff had "poor" judgment and "minimal" insight into his condition. (R. 487).  At his initial appointment with Dr. Gonzalez-Aviles in September 2022, the doctor stated that Plaintiff's "insight [was] limited." (R. 586).  In April 2024, over a year and a half since first treating Plaintiff, Dr. Gonzalez-Aviles opined the same. (R. 698).

[21] Plaintiff was hospitalized in 2008 because of aggressive behavior; his mother also reported he had a history of anger issues and violence towards her, his sister, and his stepfather. (R. 276).  At his hearing, Plaintiff testified that he was currently homeless because he "had some family troubles" and could no longer stay with his grandmother, (R. 41); according to the record, Plaintiff assaulted his grandmother in November 2021, (R. 66).  Along with the 2008 hospitalization, Plaintiff had three other psychiatric hospitalizations. (R. 16).  He was admitted to University Hospital from January 31, 2022 to February 4, 2022 for psychosis. (*Id.*).  From August 29, 2022 to September 3, 2022, Plaintiff was admitted to Paramus Health Care System for schizophrenia. (*Id.*).  He was also involuntarily admitted to Stony Brook Hospital for psychosis and schizophrenia following an incident at a mall in New Jersey. (R. 16, 584).  A security guard confronted him at the mall because he was shirtless (he stated that "she [did] not understand[] that he was planning to buy a shirt as the one he had was sweaty because it was hot outside"); Plaintiff exposed his genitals, and she called the police. (R. 584).

[22] At his hearing, Plaintiff testified that he gets easily aggravated, especially "when [he] feel[s] misunderstood or [] like people are not trying to comprehend what [he] want[s] to say or willing to ... understand where [he's] coming from." (R. 45).  Plaintiff stated that while he tries not to make his aggravation and aggression a "habit," it is something he has to deal with. (*Id.*).  Dr. Gonzalez-Aviles also stated that Plaintiff "gets easily frustrated [and] angry," and has a "history of irritability and violence when frustrated." (R. 717-18).

RFC determination considered Plaintiff's reluctance to take his medications or the frequency with which he did not comply with his prescribed treatment.

Moreover, the ALJ stated that Plaintiff's RFC was greater than alleged because his psychiatric treatment has been "routine and conservative," and that Plaintiff "has not been enrolled in any mental health treatment program and does not undergo therapy." (R. 19).  While accurate, this fails to address other evidence in the record showing Plaintiff often refused mental health treatment "due to limited insight into his conditions, or in attempts to underplay its severity or deny its existence altogether." (Pl. Br. at 26); *see also supra* n.19; *Rucker*, 48 F.4th at 93 (reversing ALJ's decision in part because, although Rucker frequently denied experiencing psychiatric symptoms, evidence showed "robust history of significant objective psychiatric symptoms"); *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 741 (S.D.N.Y. 2018) (remanding because although ALJ said his RFC determination was "supported by the lack of consistent psychiatric treatment," this statement "[did] not explain whether the ALJ considered plaintiff's mental limitations in his RFC analysis, and if not, what the ALJ's reasoning was for that omission.").  Failing to properly consider all of Plaintiff's mental impairments when determining his RFC "is an independent ground for remand." *Garcia*, 2022 WL 4234555, at *13.

Finally, ALJ McCormack's RFC determination is silent on whether any of the jobs the Vocational Expert listed could accommodate the extremes of Plaintiff's behavior when his psychiatric symptoms were untreated or triggered.  Courts have found remand is appropriate where an ALJ does not explain how the hypothetical posed to a vocational expert "accounted for plaintiff's mental health limitations." *Rousey*, 285 F. Supp. 3d at 742; *see also Dixon v. Astrue*, Civil No. 10-5703 (RBK), 2011 WL 4478493, at *10-*12 (D.N.J. Sept. 26, 2011) (although the ALJ "properly evaluated" that plaintiff's depression was not severe, he erred in failing to account

for plaintiff's depression in evaluating her RFC, and by not "includ[ing] any depression-related impairments in the hypothetical question posed to the vocational expert").  Similarly, while ALJ McCormack asked VE Moyes about jobs that an individual limited to only occasional interaction with supervisors and co-workers and no interaction with the general public could perform, (R. 50-52), the hypothetical did not inquire as to what roles might be available to someone with a history of psychiatric outbursts and aggressive behavior, nor did it question to what extent such behavior would be tolerated in the workplace, if at all.  Thus, the ALJ erred in failing to include any specific behavioral-related impairments or limitations in the hypothetical posed to the VE, or "to offer a reason discounting [these symptoms]." *Dixon*, 2011 WL 4478493, at *12.  Consequently, the Court cannot determine whether the ALJ's RFC determination was based on substantial evidence. *See id.*

Therefore, on remand ALJ McCormack must explicitly discuss the symptoms of Plaintiff's mental impairments and triggers – including that he "gets easily frustrated" and his history of irritability, anger, and violence when frustrated, (R. 717-18) – and the impact that these behavioral issues may have, if any, on Plaintiff's ability to adapt to the stress of the workplace and interact with others, *see Rousey*, 285 F. Supp. 3d at 740-41 (collecting cases) ("Even where 'substantial evidence supports the ALJ's finding that [a claimant's] mental impairment was nonsevere, it would still be necessary to remand ... for further consideration [where] the ALJ failed to account [for the claimant's] mental limitations when determining her RFC.'") (alterations in original) (quoting *Parker-Grose v. Astrue*, 462 F. App'x. 16, 18 (2d Cir. 2012) (summary order)).  While ALJ McCormack's RFC determination limited Plaintiff to a "very low level of human interaction," a question remains as to "whether that low level is itself sufficient" given Plaintiff's mental health impairments, including Plaintiff's intermittent

explosive disorder, as well as his history of noncompliance with his medication. *Rucker*, 48 F.4th at 92.  Indeed, "the Social Security Administration has itself emphasized the importance of crafting an individualized assessment of non-exertional impairments, such as difficulties interacting with others." *Id.*; *see also* Social Security Ruling 85-15: Titles II, XVI: Capability to Do Other Work—The Medical-Vocational Rules As A Framework For Evaluating Solely Non-exertional Impairments, 1985 WL 56857, at *6 ("The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. ... Any impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment.").  Thus, the ALJ should explicitly address if Plaintiff's RFC requires any additional limitations based on specific symptoms of his mental illness that are discussed throughout the record; if not, he must explain why.  Even if Plaintiff's extreme psychiatric symptoms occurred infrequently, ALJ McCormack has a duty to explain if, and how, he factored in Plaintiff's history of aggression into the RFC determination. *See Garcia*, 2022 WL 4234555, at *14 (remanding because the ALJ did not consider claimant's mental limitations when defining her RFC, thus he "failed to engage in the type of more detailed assessment that an ALJ is required in reaching an RFC determination.").

Given these deficiencies in the ALJ's analysis, remand for further evaluation of the evidence is necessary.  Accordingly, the Court remands the case for further consideration of Plaintiff's RFC.

## III.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion is granted, and the case is remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Opinion and Order.

- 43 -

The Clerk of Court is respectfully requested to terminate the pending motion (Docket No. 16), and close the case.

Dated: May 15, 2026
       White Plains, New York

                                        **SO ORDERED:**

                                        _____
                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge